IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Philip A. Brimmer**

Civil Action No. 18-cv-01056-PAB-NRN

NICHOLAS JASON HALL,

     Plaintiff,

v.

MATT ELBE,
     Defendant.

_____

**ORDER**
_____

     This matter is before the Court on Defendant Lieutenant Elbe's Motion for Summary Judgment pursuant to Fed. R. Civ. P. 56 [Docket No. 105].  The Court has jurisdiction pursuant to 28 U.S.C. § 1331.

## I. BACKGROUND[1]

     This action arises from plaintiff's time as a pretrial detainee from April 17, 2017 until December 7, 2018 at the Weld County Jail ("WCJ"), in Weld County, Colorado.  Docket No. 105 at 2, ¶ 1.  Defendant Matt Elbe was the Inmate Services Director at WCJ while plaintiff was incarcerated there.  *Id.*, ¶ 2.

     When plaintiff arrived at WCJ in April he was served a regular food tray because he was listed as Christian and had not requested a special meal.  *Id.* at 3, ¶ 7.  Plaintiff is a Muslim and requested meals that aligned with his faith.[2]  *Id.*, ¶ 8; Docket No. 126 at 3,

_____

[1] The following facts are undisputed unless otherwise indicated.
[2] The parties dispute when plaintiff became a practicing Muslim.  Docket No. 126 at 6, ¶ 51; Docket No. 131 at 3, ¶ 51.  The parties also dispute whether plaintiff

6, ¶¶ 8, 51.  Plaintiff began receiving vegan meals that were halal, which plaintiff believed was permissible under Islamic dietary laws.  Docket No. 105 at 3, ¶¶ 8-11. Plaintiff believes that the requirement that foods be halal pertains to meat and food that may have been contaminated by meat.  *Id.*, ¶ 12.  Plaintiff does not believe Islam requires that he eat meat; plaintiff, however, wanted to have certified halal meals that included meat.  *Id.* at 4, ¶¶ 13-15.  Plaintiff switched from a vegan diet to a Kosher diet in late June or early July 2017.  *Id.*, ¶ 16.  The Kosher meals were halal.[3]  *Id.*, ¶ 19. Around September 2017, plaintiff requested "halal-certified" meals that included meat. *Id.* at 5, ¶ 21.  In response, WCJ provided plaintiff with halal-certified[4] meals.[5]  *Id.*, ¶ 22.

Plaintiff requested a Quran in late April or early May in 2017 for Ramadan.  *Id.* at 5, ¶ 27.  Plaintiff was not prevented from obtaining a Quran through his own efforts, such as purchasing one from an authorized publisher, or through personal connections in the Islamic community, as long as he complied with WCJ's safety and security policies.  *Id.*, ¶ 26.  At the time plaintiff requested a Quran, WCJ did not have any Qurans in stock.

---

requested a halal meal or a Kosher meal upon arrival at WCJ.  Docket No. 105 at 3, ¶ 8; Docket No. 126 at 3, ¶ 8.

[3]  Plaintiff claims "[i]t was not relayed to Mr. Hall that what he was being served was permissible under Islamic dietary laws."  Docket No. 126 at 4, ¶ 19.  This does not create a factual dispute, first, because it does not call into question whether the meals were halal.  Additionally, plaintiff's citation does not support plaintiff's claim.  *See* Docket No. 126 at 4, ¶ 19 (citing 105-6 at 5, 62:19-23).  In Mr. Hall's deposition, he states that in May 2017 he was informed that WCJ "did not provide halal diets."  Docket No. 105-6 at 4-5, 61:23-62:23.  Defendant claims that plaintiff was told that the Kosher meals were halal when he switched to Kosher meals in June or July and provides documentation that Mr. Hall was informed.  Docket No. 105 at 4, ¶ 19 (citing Docket No. 105-8); *see* Docket No. 105-8 at 2 ("[T]he food service provider indicates that the Kosher diet they provide is also an approved Halaal diet.").

[4]  The Court uses the spellings of halal, Jumua'ah, and Quran from defendant's motion.  *See* Docket No. 126 at 3, 5, 7.

[5]  Plaintiff states that it is disputed whether he knew the meals were halal, but provides no evidence of a genuine dispute.  Docket No. 126 at 4, ¶ 22.

*Id.*, ¶ 24.  WCJ relies on donations to provide inmates with religious texts.  *Id.*, ¶ 23.

The chaplain at WCJ tried to obtain a donated Quran.  *Id.* at 6, ¶ 28.  The chaplain also

printed specific chapters of the Quran for plaintiff while he searched for a bound copy.

*Id.*, ¶ 29.   On June 23, 2017, WCJ received donated Qurans and the chaplain provided

one to plaintiff on June 26, 2017, the day plaintiff states was the last day of Ramadan.

*Id.*, ¶ 30.

Plaintiff has tried to contact an Imam, a religious leader in Islam, to conduct

Jumua'ah and did not receive a response.[6]  *Id.* at 7, ¶ 38.  Plaintiff informed defendant

that an Imam was necessary to facilitate Jumua'ah at WCJ.  *Id.*, ¶ 39.  WCJ relies on

volunteers to provide religious services and counseling, and the WJC chaplain has been

unable to find Muslim volunteers to visit WCJ.  *Id.*, ¶¶ 33-34.  The WCJ chaplain

repeatedly searched for Muslim volunteers while plaintiff was incarcerated to facilitate

communication between plaintiff and a religious leader and to conduct religious

services.  *Id.*, ¶ 35.  No Muslim volunteers have offered to conduct religious services at

WCJ.  *Id.*, ¶ 34.  The WCJ chaplain contacted everyone plaintiff suggested as a

volunteer, provided plaintiff with information on how to contact mosques in the Front

Range, contacted mosques in Greeley, Boulder, and Fort Collins, asked the president of

the Islamic Center of Fort Collins to volunteer or to recommend volunteers, and

consulted with a consortium of Front Range jail chaplains.  *Id.*, ¶¶ 34-36.  The chaplain

offered counseling to inmates, regardless of an inmate's religious affiliation.  *Id.*, ¶ 37.

WCJ allowed plaintiff to pray individually in his cell, and WCJ provided him with an extra

---

[6]  Jumua'ah is a weekly prayer service held on Fridays.  Docket No. 77-2 at 4,
¶ 19.

towel and blanket to facilitate that prayer.  *Id.* at 8, ¶¶ 41-43.  Plaintiff stated that, before

he was incarcerated, that he prayed on his own in place of attending Jumua'ah when he

had to work.  *Id.*, ¶ 45.  WCJ did not prohibit plaintiff from gathering and praying with

other inmates during "out-of-cell time" as long as the safety and security of other

inmates was not jeopardized.  *Id.*, ¶ 46.  Religious services are allowed pursuant to

WCJ policy, subject to safety and security concerns, and inmates may not act in a

position of spiritual authority over other inmates.  *Id.* at 9, ¶¶ 48-49.

Plaintiff brings claims against defendant Matt Elbe for four violations of his

constitutional rights pursuant to the Free Exercise Clause of the First Amendment.

Docket No. 77-2 at 6-8.  Plaintiff claims defendant violated his constitutional rights by

"refusing to provide [plaintiff] with a halal diet," "refusing to provide [plaintiff] with a

Qu'ran," "refusing to provide [plaintiff] access to Jum[ua]'ah," and "denying [plaintiff]

access to an Imam."  *Id.* at 6-8, ¶¶ 38, 43, 48, 52.  Defendant moves for summary

judgment on all four claims and on plaintiff's request for compensatory damages.

Docket No. 105 at 9, 18-20.[7]  Defendant claims that no factual disputes exist on each of

plaintiff's claims and that defendant is entitled to qualified immunity.

## II.  LEGAL STANDARD

### A.  <u>Summary Judgment</u>

Summary judgment is warranted under Federal Rule of Civil Procedure 56 when the

"movant shows that there is no genuine dispute as to any material fact and the movant

is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see Anderson v.*

---

[7]  Defendant also moves for summary judgment on plaintiff's claim for punitive damages, Docket No. 105 at 20, but plaintiff does not request punitive damages. Docket No. 126 at 20 n.6.

*Liberty Lobby, Inc.*, 477 U.S. 242, 248-50 (1986).  A disputed fact is "material" if, under the relevant substantive law, it is essential to proper disposition of the claim.  *Wright v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231-32 (10th Cir. 2001).  Only disputes over material facts can create a genuine issue for trial and preclude summary judgment.  *Faustin v. City & Cnty. of Denver*, 423 F.3d 1192, 1198 (10th Cir. 2005).  An issue is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party.  *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997).

Where "the moving party does not bear the ultimate burden of persuasion at trial, it may satisfy its burden at the summary judgment stage by identifying a lack of evidence for the nonmovant on an essential element of the nonmovant's claim."  *Bausman v. Interstate Brands Corp.*, 252 F.3d 1111, 1115 (10th Cir. 2001) (quotations omitted).  "Once the moving party meets this burden, the burden shifts to the nonmoving party to demonstrate a genuine issue for trial on a material matter."  *Concrete Works of Colo., Inc. v. City & Cty. of Denver*, 36 F.3d 1513, 1518 (10th Cir. 1994).  The nonmoving party may not rest solely on the allegations in the pleadings, but instead must designate "specific facts showing that there is a genuine issue for trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (quotations omitted).  "To avoid summary judgment, the nonmovant must establish, at a minimum, an inference of the presence of each element essential to the case."  *Bausman*, 252 F.3d at 1115.  When reviewing a motion for summary judgment, a court must view the evidence in the light most favorable to the non-moving party.  *Id.*

**B.  <u>Qualified Immunity</u>**

Qualified immunity shields government officials from claims for money damages absent a showing that (1) the official violated a constitutional right and (2) the right was "clearly established" at the time the challenged conduct occurred. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). In contrast to a motion for summary judgment – which places the burden on the moving party to demonstrate the lack of a genuine issue of material fact – a motion for summary judgment based on a claim of qualified immunity shifts the burden to the non-moving party. *Lynch v. Barrett*, 703 F.3d 1153, 1158 (10th Cir. 2013).

Accordingly, a plaintiff opposing a motion for summary judgment on the basis of qualified immunity must carry a two-part burden. *Hobbs ex rel. Hobbs v. Zenderman*, 579 F.3d 1171, 1183 (10th Cir. 2009). First, he must show that "a 'favorable view' of the facts alleged show[s] the violation of a constitutional right." *Holland ex rel. Overdorff v. Harrington*, 268 F.3d 1179, 1186 (10th Cir. 2001) (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001) (*overruled on other grounds by Pearson v. Callahan*, 555 U.S. 223, 235-36 (2009)). Second, he must show that the right violated was clearly established at the time of the defendant's actions. *Serna v. Colo. Dept. of Corrs.*, 455 F.3d 1146, 1150 (10th Cir. 2006) (citing *Medina v. Cram*, 252 F.3d 1124, 1128 (10th Cir. 2001)).

A constitutional right is clearly established for the purpose of qualified immunity if "its contours [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002); *Morris v. Noe*, 672 F.3d 1185, 1196 (10th Cir. 2012) ("The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.") (internal citation omitted).

In other words, the "salient" question is whether "the state of the law" at the time of the defendant's challenged actions afforded "fair warning" that those actions were unconstitutional.  *Hope*, 536 U.S. at 741.

"Ordinarily, [the Tenth Circuit requires] that for a rule to be clearly established[,] there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains."  *Casey v. City of Fed. Heights*, 509 F.3d 1278, 1284 (10th Cir. 2007) (internal quotations and citation omitted).  However, it is not necessary that prior cases evidence an identical set of facts.  *Pierce v. Gilchrist*, 359 F.3d 1279, 1298 (10th Cir. 2004).  *Hope* "shifted the qualified immunity analysis from a scavenger hunt for prior cases with precisely the same facts toward the more relevant inquiry of whether the law put officials on fair notice that the described conduct was unconstitutional."  *Id.*  The Tenth Circuit accordingly treats cases as lying along a spectrum: the more "obviously egregious" the conduct, "the less specificity is required from prior case law."  *Id.*  This approach requires government officials to make "reasonable applications of the prevailing law to their own circumstances."  *Id.* (citation omitted).

## III.  ANALYSIS

"Under the First . . . Amendment[ ], inmates are entitled to the reasonable opportunity to pursue their sincerely-held religious beliefs."  *Gallagher v. Shelton*, 587 F.3d 1063, 1069 (10th Cir. 2009).  Consequently, "[t]he first questions in any free exercise claim are whether the plaintiff's beliefs are religious in nature, and whether those religious beliefs are sincerely held."  *Kay v. Bemis*, 500 F.3d 1214, 1218 (10th Cir. 2007) (citations omitted).

To state a free exercise claim, an incarcerated plaintiff must first show that a prison regulation "substantially burdened [his] sincerely-held religious beliefs." *Id.* (citation omitted). If the plaintiff shows that his sincerely held religious belief has been substantially burdened, defendant must "identif[y] the legitimate penological interests that justif[ied] the impinging conduct." *Id.* (citations and footnote omitted). Assuming that defendant does so, "[t]he burden then returns to the prisoner to 'show that these articulated concerns were irrational.'" *Id.* at 1218 n.2 (citation omitted).

### A. Halal Diet

Plaintiff alleges defendant violated his constitutional rights by denying him a halal diet. Docket No. 77-2 at 6, ¶ 38. Plaintiff claims that he holds a sincere religious belief that he must observe a halal diet, Docket No. 126 at 7, ¶ 55, which defendant disputes. Docket No. 131 at 3, ¶ 55. "[C]ourts have rightly shied away from attempting to gauge how central a sincerely held belief is to the believer's religion." *Kay*, 500 F.3d at 1220 (quoting *Watts v. Fla. Int'l Univ.*, 495 F.3d 1289, 1295 (11th Cir. 2007)). The Court will assume that plaintiff sincerely believes he must eat a halal diet.

Plaintiff's complaint alleges that "Elbe imposed a substantial burden on Hall's exercise of his sincerely held religious beliefs when he refused to provide Hall with a halal diet." Docket No. 77-2 at 6, ¶ 37. Plaintiff, however, does not allege that he was served a meal that was not halal at any time. *Id.* In terms of being served meat, defendant argues that plaintiff's request for meat was "a mere preference" that did not rise to the level of a substantial burden. Docket No. 105 at 10.

A substantial burden is created when

the government (1) requires the plaintiff to participate in an activity prohibited by a sincerely held religious belief, (2) prevents the plaintiff from

8

> participating in an activity motivated by a sincerely held religious belief, or (3) places considerable pressure on the plaintiff to violate a sincerely held religious belief—for example, by presenting an illusory or Hobson's choice where the only realistically possible course of action available to the plaintiff trenches on sincere religious exercise.

*Yellowbear v. Lampert*, 741 F.3d 48, 55 (10th Cir. 2014).

The Tenth Circuit has held that a plaintiff with a sincere belief that he needs to eat meat as a part of halal diet is substantially burdened when prison officials offered only a non-halal option and a vegetarian option.[8]  *Abdulhaseeb v. Calbone*, 600 F.3d 1301, 1317 (10th Cir. 2010).  In *Abdulhaseeb*, both options defendants provided to plaintiff violated his religious beliefs and therefore defendants presented plaintiff with "a Hobson's choice—either he eats a non-halal diet in violation of his sincerely held beliefs, or he does not eat."  *Id.* at 1317.  Plaintiff here argues that he faced similar pressure to violate his beliefs because he had to choose between a diet that violated his religious beliefs and a vegan diet.  Docket No. 126 at 10.

Although "every single presentation of a meal an inmate considers impermissible" does not impose a substantial burden, "as the frequency of presenting unacceptable foods increases, at some point the situation would rise to the level of a substantial burden."  *Abdulhaseeb*, 600 F.3d at 1321.  On one hand, a "nutritionally adequate diet may still substantially burden an inmate in his ability to adhere to a religious diet.  For example, the nutritionally adequate foods at issue may not conform to the inmate's religious beliefs as to what is allowed in his religious diet or, . . . may be inedible or

---

[8] *Abdulhaseeb* involved a claim under the Religious Land Use and Institutional Persons Act, which involves a different test than a First Amendment free exercise claim, but both share the same standard as to whether a substantial burden was imposed on a plaintiff's religious beliefs.  *See Strope v. Cummings*, 381 F. App'x 878, 881 (10th Cir. 2010) (unpublished).

sickening." *Blair v. Raemisch*, 804 F. App'x 909, 918 n.11 (10th Cir. 2020)

(unpublished).  The Tenth Circuit has noted that "the option to eat only bread presents

as much of a Hobson's choice as the option not to eat at all." *Khan v. Barela*, 808 F.

App'x 602, 616 n.13 (10th Cir. 2020) (unpublished).  On the other hand, "non-preferred

or occasionally unsatisfactory items in a meal" that do not "completely den[y] an edible

meal to the prisoner" do not create a substantial burden.  *Strope*, 381 F. App'x at 882.

Allegations that only challenge "the variety, quality, and rotation of meals" do not

support a claim of a substantial burden.  *Blair*, 804 F. App'x at 918 n.12.  Ultimately the

question of whether a substantial burden is imposed depends on whether the restriction

exerts "considerable pressure [on plaintiff] to abandon [his] religious exercise."

*Yellowbear*, 741 F.3d at 55.

Although plaintiff's complaint alleges he was denied a halal diet, Docket No. 77-2 at

6, ¶¶ 37-38, his opposition to defendant's motion for summary judgment argues he was

effectively denied a halal diet because his only other option was a restrictive vegan diet.

Docket No. 126 at 10.  Plaintiff was provided a vegan meal from sometime after his

arrival in April 2017 until he requested a change to a Kosher diet in June or July 2017.

Docket No. 105 at 3-4, ¶¶ 7-8, 16.  Plaintiff argues that a vegan diet is highly restrictive

for a person who does not want to maintain a vegan diet, but does not provide any other

reasons why a vegan diet caused him a substantial burden.  Docket No. 126 at 10-11.

Plaintiff was not forced to take an action in violation of his religious beliefs.  Plaintiff also

does not believe Islam requires him to eat meat.  Docket No. 105 at 4, ¶ 14.  He was

not forced to abstain from a practice required by his religious beliefs.  Plaintiff does not

allege or introduce any evidence that shows the vegan meals WCJ provided did "not

conform to [his] religious beliefs as to what is allowed in his religious diet," that they were nutritionally inadequate, or were "inedible or sickening."  *See Blair*, 804 F. App'x at 918 n.11.

Plaintiff identifies no cases, and the Court is aware of no cases, in which a lack of meat has been ruled to cause a substantial burden where the lack of meat did not cause a violation of a religious belief, adverse physical effects, or result in nutritionally inadequate meals.  *Compare Abdulhaseeb*, 600 F.3d at 1320 (finding a substantial burden where a vegetarian diet conflicted with plaintiff's religious beliefs), *and AlAmiin v. Patton*, 2016 WL 11475169, at *18 (W.D. Okla. Aug. 30, 2016) (finding a substantial burden where plaintiff had to choose between a non-halal meal with meat and a vegetarian halal meal with insufficient nutritional value such that it interfered with the practice of plaintiff's religion), *and Shakur v. Schriro*, 514 F.3d 878, 888 (9th Cir. 2008) (finding a substantial burden where a vegetarian diet caused adverse physical effects that "interfere[d] with the ritual purity required for [plaintiff's] Islamic worship"), *with Sefeldeen v. Alameida*, 238 F. App'x 204, 206 (9th Cir. 2007) (unpublished) (declining to find a substantial burden where plaintiff was given a vegetarian diet that did not violate his religious beliefs, caused "no adverse physical effects," or "nutritional inadequacy").  The Court finds that plaintiff has not shown any evidence that a vegan diet caused plaintiff a substantial burden by coercing him to violate his religious beliefs.

Additionally, plaintiff and defendant dispute whether the Kosher diet plaintiff was provided conformed with plaintiff's beliefs.  Docket No. 105 at 4, ¶ 17; Docket No. 126 at 4, ¶ 17.  This discussion is not relevant to the question of whether plaintiff faced a substantial burden since plaintiff requested a change to a Kosher diet and could have

maintained his vegan diet without violating his religious beliefs.  Docket No. 105 at 4, ¶ 18.

Finally, plaintiff argues that it is disputed whether plaintiff eventually received halal-certified meals after his request in September 2017 for halal-certified meals with meat because he was not provided with any certifications.  Docket No. 126 at 11.  Plaintiff identifies no facts to support his allegation that he did not receive documentation that his meals were halal-certified and does not identify any facts that show he did not receive halal-certified meals in response to his request.  *See id.*  This argument does not create a factual dispute.  Plaintiff has not demonstrated that he was served any meals in violation of his religious beliefs or that he was provided meals so insufficient as to coerce him into violating his religious beliefs.  Accordingly, plaintiff has not identified any factual disputes regarding a substantial burden based on his request for a halal diet.

Even if plaintiff was able to show that he faced a substantial burden, defendant argues that he is entitled to qualified immunity because plaintiff fails to show that defendant violated clearly established law.  Docket No. 105 at 12-13.  "Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains."  *Clark v. Wilson*, 625 F.3d 686, 690 (10th Cir. 2010) (citation omitted).  The Tenth Circuit has recognized that, "[e]ven when no precedent involves facts 'materially similar' to ours, the right can be clearly established if a precedent applies with 'obvious clarity.'"  *Lowe v. Raemisch*, 864 F.3d 1205, 1210 (10th Cir. 2017).  However, the Supreme Court has repeatedly stated that

the law that must be clearly established should be particularized to the facts of the case. *See White v. Pauly*, 580 U.S. 73, 552 (2017) ("Today, it is again necessary to reiterate the longstanding principle that clearly established law should not be defined at a high level of generality.  As this Court explained decades ago, the clearly established law must be particularized to the facts of the case." (internal quotations and citations omitted)).

Plaintiff argues that there is a clearly established "First Amendment right to meals conforming to . . . sincerely held religious beliefs."  Docket No. 126 at 12 (citing *Beerheide v. Suthers*, 286 F.3d 1179, 1185 (10th Cir. 2002)).  At least one court in this circuit has ruled that where a plaintiff received some halal meals with meat, a "fail[ure] to serve Plaintiff his *requested quantity* of outside-certified, meat-containing halal meals" is "beyond the clearly established right described in *Beerheide*."  *AlAmiin*, 2016 WL 11475169, at *23 (emphasis in original).  Plaintiff does not cite any cases, and the Court is not aware of any cases, where a delay in providing halal-certified meat to a prisoner violated a clearly established right when the provided meals did not cause a prisoner to violate his religious beliefs, did not cause adverse physical effects, and were nutritionally adequate.  Plaintiff has not demonstrated that his claim violates clearly established law and his claim will be rejected on the alternative basis that defendant is entitled to qualified immunity.

### B.  Quran

Given that defendant fails to show any undisputed facts otherwise, the Court will assume that plaintiff holds a sincerely held belief that he must read the entire Quran during Ramadan.  Docket No. 126 at 7, ¶ 59; Docket No. 131 at 4, ¶ 59.  Plaintiff

requested a Quran in late April or early May in 2017 for Ramadan.  Docket No. 105 at 5,

¶ 27.  The chaplain at WCJ tried to obtain a donated Quran and printed out chapters of

the Quran for plaintiff.  *Id.* at 6, ¶ 29.  On June 23, 2017, WCJ received donated

Qurans, and the chaplain provided one to plaintiff by June 26, 2017, the last day of

Ramadan.  *Id.*, ¶ 30.  Plaintiff was not prevented from obtaining a Quran through his

own efforts, as long as he complied with WCJ's safety and security policies.  *Id.* at 5,

¶ 26.

Plaintiff alleges that he was substantially burdened by an inability to read the entire

Quran during Ramadan.  Docket No. 77-2 at 6, ¶¶ 40-42.  Plaintiff argues this was a

substantial burden under *Yellowbear* because plaintiff was prevented "from participating

in an activity motivated by a sincerely held religious belief".  *Yellowbear*, 741 F.3d at 55;

Docket No. 126 at 12.  Plaintiff, however, has not demonstrated that a WCJ policy

prevented him from reading the Quran.  Plaintiff takes issue with WCJ's failure to

"provide" him with a Quran in a timely fashion.  Docket No. 126 at 12.  The WCJ allowed

plaintiff to obtain a Quran through the procedures in place at WCJ, the chaplain gave

plaintiff chapters of the Quran during Ramadan, and the chaplain gave him a copy of

the Quran when he obtained one.  Docket No. 105 at 5-6, ¶¶ 26, 29, 30.

Defendant argues that plaintiff was not substantially burdened because WCJ

provided plaintiff with a Quran as soon as WCJ had access to one and because WCJ

gave plaintiff printed chapters of the Quran until WCJ received a hard copy of the Quran

for plaintiff.  *Id.* at 13-14.  Plaintiff responds that "[p]roviding [plaintiff] only certain

chapters hardly alleviated the substantial burden on his religious exercise."  Docket No.

126 at 13.  Plaintiff, however, does not argue that he failed to get the chapters of the

Quran that he requested or why the copies, as opposed to a bound version, substantially burdened him.  *See id.*  Plaintiff states that he was not allowed to receive a copy of the Quran his ex-wife attempted to provide him, *id.*, but does not argue that denial of that copy constituted the substantial burden.

Plaintiff has not demonstrated that WCJ was required to provide him with a Quran in order to avoid placing a substantial burden on his religion.  Courts in the Tenth Circuit have repeatedly held that the prohibition on substantially burdening the practice of religion is not a requirement that religion be affirmatively subsidized or facilitated.  *See Polk v. Patterson*, 2011 WL 1897798, at *6 (D. Utah May 18, 2011) (finding no violation of a plaintiff's free exercise rights where donations of religious texts were accepted, plaintiff was permitted to keep a copy of a religious text in his cell, and plaintiff  did not "present[] any legal support for his contention that prison officials have an affirmative obligation to provide inmates with religious literature of their choosing"); *Hamlin v. Smith*, No. 07-cv-01058-CBS-KMT, 2010 WL 2740119, *8 *(D. Colo. July 12, 2010) (finding no substantial burden under the Free Exercise Clause or RLUIPA where a prison did not provide the correct type of wand for religious practices, but did allow for the possession of wands); *Williams v. Miller*, 2015 WL 1207011, at *17 (W.D. Okla. Mar. 12, 2015) (ruling plaintiff failed to state a claim for a Free Exercise Clause violation where "[d]efendant [] attempted to obtain donated Qu'rans but was [not] able to do so in time for Ramadan"); *cf. Abdulhaseeb*, 600 F.3d at 1321 (differentiating between substantially burdening religion and affirmatively subsidizing religion and ruling prisons do not need to purchase religious texts under RLUIPA); *Pfeil v. Lampert*, 603 F. App'x 665, 670 (10th Cir. 2015) (unpublished) ("Even under the stricter obligations imposed by

RLUIPA, the State is 'not require[d][. . .] to pay for an inmate's devotional accessories.'") (quoting *Cutter v. Wilkinson,* 544 U.S. 709, 720 n.8, (2005)).

Plaintiff cites *Kay*, 500 F.3d at 1220, for the proposition that "inmates should receive religious materials consistent with their sincerely held religious beliefs."  Docket No. 126 at 14.  In that case, the Tenth Circuit ruled that, where a plaintiff was not allowed "permission to possess tarot cards in order to practice his religion," the plaintiff was not required to show that the cards were "'necessary' to the practice of his religion if his belief in their use was sincerely held."  *Kay*, 500 F.3d at 1220.  Here, WCJ did allow possession of Qurans and provided plaintiff with printed chapters during Ramadan while the chaplain sought a donated copy.  Docket No. 105 at 5, 6, ¶¶ 26, 29.  *Kay* does not hold that a prison must provide religious materials.  Plaintiff also cites *Kahn v. Barela*, 2020 WL 5977930, at *12 (D.N.M. Oct. 8, 2020), as holding that "dismissal of plaintiff's First Amendment claim was not warranted, because the plaintiff had alleged that he did not have access to a Qur'an as none were available at the facility's library."  Docket No. 126 at 14.  In that case, plaintiff's claims under the Establishment Clause and the Equal Protection Clause of the Fourteenth Amendment survived a motion to dismiss where a correctional facility provided Christian literature in its library, but the library contained "no Quran or other Islamic text."  *Kahn*, 2020 WL 5977930, at *12.  However, neither *Kay* nor *Kahn* support plaintiff's assertion that WCJ was required to provide plaintiff with a Quran.  *Kay* focuses on a prohibition on possession of religious items, 500 F.3d at 1220, and *Kahn* only addresses access to a Quran as compared to access to different religious materials based on Establishment Clause and Equal Protection Clause claims. 2020 WL 5977930, at *12.  Additionally, to the extent plaintiff argues WCJ could have

obtained a Quran from a library or asked other inmates to loan Mr. Hall a Quran, Docket No. 126 at 13, neither alternative explains why WCJ was under an obligation to procure a Quran.

Even if WCJ was obligated to provide a Quran to plaintiff, WCJ provided plaintiff with printed out chapters of the Quran in response to his request and provided a full copy to plaintiff on the last day of Ramadan.  Outside of stating that providing "certain chapters hardly alleviated the substantial burden" on plaintiff's religious exercise, *id.*, plaintiff does not explain why he could not have read the entire Quran through the printed chapters or why he could not obtain a Quran by authorized methods.[9]  Plaintiff has not demonstrated that a failure to address his request for a Quran constituted a substantial burden.

Finally, plaintiff argues that determining whether WCJ's policy of relying on donated Qurans furthered any penological goals is a fact question for the jury to resolve because WCJ spends money on other religious needs, by hiring a chaplain and supplying Kosher meals.  *Id.* at 13.  However, plaintiff must first show that WCJ substantially burdened his free exercise of religion through its policies regarding inmates possessing copies of the Quran.  Defendant has demonstrated that its policies do not do so, and the Court therefore does not need to decide whether legitimate penological interests justified the burden.  *Kay*, 500 F.3d at 1218 n.2.  Therefore, the Court will grant summary judgment on this claim.

---

[9] Plaintiff states his ex-wife was not able to give him a copy of the Quran.  Docket No. 126 at 13.  This single instance of a denial does not explain why plaintiff could not use the authorized WCJ procedures to buy or obtain a Quran.

C. **Jumua'ah**

Plaintiff alleges that he was substantially burdened by his inability to convene weekly

with other Muslims for Jumua'ah prayers.  Docket No. 77-2 at 4, ¶¶ 19-22; Docket No.

126 at 14.  The Court will assume that it is plaintiff's sincerely held belief that he must

attend Jumua'ah prayers with other Muslims.  *Id.* at 7, ¶ 54; Docket No. 131 at 3, ¶ 54.

Plaintiff claims that he was substantially burdened because he was prevented "from

participating in an activity motivated by a sincerely held religious belief."  *Yellowbear*,

741 F.3d at 55.  WCJ policy requires volunteers to provide religious services, and the

chaplain at WCJ attempted to secure a volunteer to provide Islamic services.  Docket

No. 105 at 7, ¶¶ 33-36.  Since no volunteer was found, Islamic services were not

provided.  *Id.*  Inmates at WCJ are prohibited from "acting in a position of spiritual

authority over other offenders" and cannot lead religious services.  *Id.* at 9, ¶ 49.

Plaintiff takes issue with WCJ's policy requiring a volunteer to lead religious services

and prohibiting inmates from leading services because it prevented him from convening

with other Muslims for Jumua'ah.  Docket No. 126 at 15.  Defendant argues WCJ's

policies are justified to avoid power dynamics among prisoners that could affect safety

and security.  Docket No. 105 at 16.

Defendant argues that legitimate penological interests justified the denial of plaintiff's

request to convene with others for Jumua'ah.  *See id.* at 15-18.  Defendant maintains

that plaintiff's "religious exercise was not substantially burdened" and in support states

that plaintiff believes that solitary prayer is an acceptable alternative.  *Id.* at 15, 17.

Plaintiff raises factual disputes regarding the sufficiency of solitary prayer as an

alternative to convening with other Muslims for Jumua'ah.  Docket No. 126 at 5, ¶ 39.

As it is disputed that whether plaintiff's sincerely held belief requires praying with other Muslims, and it is undisputed that plaintiff was not allowed to convene for Jumua'ah because WCJ did not have any Muslim volunteers, plaintiff has shown that he faced a substantial burden.

After the plaintiff demonstrates a substantial burden, a defendant must show that legitimate penological interests justified the burden and plaintiff must show that the articulated concerns are irrational. *Kay*, 500 F.3d at 1218 n.2. To determine whether a legitimate penological interest justifies burdening a plaintiff's religious belief, courts balance the factors articulated in *Turner v. Safley*, 482 U.S. 78 (1987):

> (1) whether a rational connection exists between the prison policy regulation and a legitimate governmental interest advanced as its justification; (2) whether alternative means of exercising the right are available notwithstanding the policy or regulation; (3) what effect accommodating the exercise of the right would have on guards, other prisoners, and prison resources generally; and (4) whether ready, easy-to-implement alternatives exist that would accommodate the prisoner's rights.

*Kay*, 500 F.3d at 1219 (quoting *Boles v. Neet*, 486 F.3d 1177, 1181 (10th Cir. 2007)). "Analysis of the four *Turner* factors is necessary at the summary judgment stage." *Al-Owhali v. Holder*, 687 F.3d 1236, 1240 (10th Cir. 2012). A court must, "on a case-by-case basis, . . . look closely at the facts of a particular case and the specific regulations and interests of the prison system in determining whether prisoners' constitutional rights may be curtailed." *Beerheide*, 286 F.3d at 1185. "The burden, moreover, is not on the State to prove the validity of prison regulations but on the prisoner to disprove it." *Sperry v. Werholtz*, 413 F. App'x 31, 40 (10th Cir. 2011) (unpublished) (quoting *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003).

First, the Court must determine whether the policy has a rational connection to a legitimate government interest.  "To satisfy this prong of the test, the prison administration is required to make a minimal showing that a rational relationship exists between its policy and stated goals."  *Beerheide*, 286 F.3d at 1186.  "[I]t does not matter whether [the Court] agree[s] with the defendants or whether the policy in fact advances the jail's legitimate interests. . . .  The only question . . . is whether the defendants' judgment was rational, that is, whether the defendants might reasonably have thought that the policy would advance its interests."  *Sperry*, 413 F. App'x at 40 (internal quotations and citations omitted).

Defendant argues that WCJ's policy prohibiting inmates from leading religious services and requiring that a volunteer lead services is rationally related to the objective of safety and security.  Docket No. 105 at 16.  Plaintiff does not suggest that safety is not a legitimate and neutral objective, but argues instead that a jury may not believe WCJ's volunteer requirement furthers the goal of safety.  Docket No. 126 at 15.  Safety and security concerns have been ruled to justify a requirement that a volunteer be present for religious services.  *See Leishman v. Patterson*, 2014 WL 2117543, *6 (D. Utah May 21, 2014) (collecting cases that hold "that policies requiring non-inmate volunteers for group worship are valid").  The Court finds defendant has made at least a minimal showing that requiring that a volunteer lead religious services is rationally related to the objectives of safety and security.  Accordingly, the Court finds that defendant has demonstrated a legitimate interest in safety rationally related to the policy prohibiting services lead by an inmate.

Next, the Court must consider whether there is an alternative means of exercising the religious belief. *Beerheide*, 286 F.3d at 1186. Defendant argues plaintiff can pray in his cell as an alternative to Jumua'ah prayer. Docket No. 105 at 17. Plaintiff stated that, before he was incarcerated, he prayed on his own instead of attending Jumua'ah when he had to work. *Id.* at 8, ¶ 45. WCJ has provided plaintiff with several accommodations to pray in his cell. *Id.*, ¶¶ 42-43. Plaintiff is also allowed to congregate and pray with other Muslim inmates during "out-of-cell time" as long as the safety of other inmates is not jeopardized. *Id.*, ¶ 46.

Plaintiff, however, argues that praying in his cell is not an acceptable alternative since Jumua'ah must be performed in a group and neither alternative provided by WCJ allows him to participate in Jumua'ah as plaintiff believes he must. Docket No. 126 at 15-16. Informal and individual prayer are not the same as "the communing of making salaht [prayer] with fellow Muslims" in Jumua'ah. *Id.* at 5, ¶ 39. This factor weighs against granting summary judgment because a factual issue exists regarding the sufficiency of the alternatives that WCJ provides as plaintiff's sincerely held belief is that he must pray with other Muslims.

Turning to the third *Turner* factor, the Court must determine what effect accommodating plaintiff's religious exercise, of participating in Jumua'ah with other Muslims, would have on guards, other prisoners, and prison resources. *Turner*, 482 U.S. at 90. If accommodation "will have a significant ripple effect on fellow inmates or on prison staff, courts should be particularly deferential to the informed discretion of corrections officials." *Id.* (quotations omitted). Although *Turner* requires deference to prison officials, in order to satisfy the third prong of the test "prison officials *must present*

*credible evidence* to support their stated penological goals." *Beerheide*, 286 at F.3d at 1189. Defendant does not introduce any undisputed facts to quantify the effect of accommodating plaintiff's request, such as the cost of providing additional officers to oversee prisoners participating in Jumua'ah or evidence of the security costs to WCJ from allowing prisoners to lead religious services. Docket No. 105 at 16-17. Defendant states that "[s]everal courts have upheld corrections facility policies that require outside volunteers to preside over group worship due to prison safety and security concerns." *Id*. at 17. This contention, however, is not sufficient to satisfy the requirement that "courts, on a case-by-case basis, [] look closely at the facts of a particular case and the specific regulations and interests of the prison system." *Beerheide*, 286 F.3d at 1185. As defendant does not identify the cost of accommodating plaintiff's request with any specificity or provide credible evidence to evince the costs of accommodation, this factor does not support granting summary judgment.

The fourth and final prong of the *Turner* test considers the presence or absence of ready alternatives that would fully accommodate plaintiff's rights at *de minimis* costs to valid penological interests. *Turner*, 482 U.S. at 90. Plaintiff suggests that an inmate could lead Jumua'ah. Docket No. 126 at 15. Defendant has established that allowing an inmate to lead religious services could pose a security risk but has not quantified the cost to penological interests. Docket No. 105 at 16-17. Plaintiff also states WCJ could make another guard available to observe, Docket No. 126 at 15, but this solution does not alleviate the safety concerns with having an inmate in a position of religious authority over other inmates. Plaintiff has not shown alternatives that do not implicate the penological interests defendant raises, but defendant fails to show that any costs

would be more than *de minimis*.  Because defendant provides no evidence that the cost of an alternative would be more than a *de minimis* cost, the Court finds that this factor does not support granting summary judgment.

The Court must balance the four *Turner* factors at the summary judgment stage.  *Al-Owhali v. Holder*, 687 F.3d 1236, 1240 (10th Cir. 2012).  Defendant has only demonstrated that the first *Turner* factor supports granting summary judgment.  It is defendant's burden as the movant to "demonstrate the absence of a genuine issue of material fact regarding their legitimate penological interests by providing 'depositions, answers to interrogatories, admissions, affidavits and the like' supporting the *Turner* factors, as opposed to mere argument."  *Hoeck v. Miklich*, No. 13-cv-00206-PAB-KLM, 2015 WL 13730079, at *7 (D. Colo. Oct. 26, 2015) (quoting *Beard v. Banks*, 548 U.S. 521, 529 (2006), *report and recommendation adopted*, 2016 WL 806749 (D. Colo. Mar. 1, 2016)).  Defendant's showing that one factor supports summary judgment is not enough to demonstrate that it is undisputed that legitimate penological interests justified WCJ's policy preventing plaintiff from attending Jumua'ah with other Muslims.

Alternatively, defendant argues that he is entitled to qualified immunity on plaintiff's third and fourth claims based on plaintiff's inability to meet with an Imam or attend Jumua'ah "because no Supreme Court decision, Tenth Circuit decision, or other courts'" decisions "would have put a reasonable person in Lt. Elbe's position on notice that his or his subordinate[s'] actions violated a clearly established constitutional right."  Docket No. 105 at 18.  Plaintiff responds that inmates have a clearly established right to attend religious services.  Docket No. 126 at 16 (citing *McKinley v. Maddox*, 493 F. App'x 928,

933 (10th Cir. 2012) (unpublished) (ruling that denying a prisoner permission to attend religious services for a month constituted a substantial burden)).

Unlike plaintiff's other claims, WCJ's policy requiring a volunteer to conduct religious services and prohibiting inmates from leading religious services "prevented the plaintiff from participating in an activity motivated by a sincerely held religious belief." *Yellowbear*, 741 F.3d at 55.  The Tenth Circuit has ruled that "[i]t was clearly established that the indefinite denial of any religious services would violate [plaintiff's] right to freely exercise his religious beliefs in the absence of a legitimate penological interest." *Williams v. Hansen*, 5 F.4th 1129, 1133 (10th Cir. 2021).  Defendant does not provide any reasons why a prohibition on plaintiff's ability to participate in Jumua'ah is distinguishable or argue that the law was not clearly established in 2017.  In response to plaintiff's argument that prohibiting attendance at religious services is clearly established as a constitutional violation, defendant responds that "[p]laintiff has identified no decision that would have put [defendant] on notice that his or his subordinate[s'] actions violated established law."  Docket No. 131 at 10.  This argument does not explain why this case does not fit under the clearly established law set forth in *Yellowbear*.  Accordingly, the Court will not grant qualified immunity to defendant on plaintiff's third claim based on Jumua'ah.

### D.  Imam

Plaintiff alleges defendant violated his First Amendment rights by denying him access to an Imam.  Docket No. 77-2 at 8, ¶ 52.  The Court assumes plaintiff holds a sincere belief that he must have access to an Imam for religious counseling.  Docket No. 126 at 7, ¶ 54; Docket No. 131 at 3, ¶ 54.  Plaintiff claims he was substantially

burdened by his inability to "access" an Imam.  Docket No. 126 at 17.  Plaintiff has two theories of a violation of his First Amendment Rights.  Under the first theory, plaintiff claims that defendant should have procured an unpaid, volunteer Imam.  Under the second, plaintiff claims that defendant should have hired an Imam.  Defendant argues that plaintiff was not substantially burdened by WCJ's failure to provide him access to an Imam.  Docket No. 105 at 18.

The Tenth Circuit has ruled that "a prisoner is entitled to a 'reasonable opportunity of pursuing his faith comparable to the opportunity afforded fellow prisoners who adhere to conventional religious precepts.'"  *Wilson v. Gunter*, 21 F.3d 1123, 1994 WL 117480, *1 (10th Cir. 1994) (unpublished) (table) (quoting *Cruz v. Beto*, 405 U.S. 319, 322 (1972)).  Under *Yellowbear*, a substantial burden is created when a person is prohibited from engaging in a necessary religious practice.  741 F.3d at 55.  The Supreme Court has ruled, however, that "[a] special chapel or place of worship need not be provided for every faith regardless of size; nor must a chaplain, priest, or minister be provided without regard to the extent of the demand."  *Cruz*, 405 U.S. at 322 n.2.  Similarly, the Tenth Circuit has held that "failing to provide a full-time paid Muslim spiritual leader" does not create a substantial burden, and the court distinguishes between a requirement to affirmatively subsidize religion and to avoid imposing a substantial burden under the RLUIPA.  *Abdulhaseeb*, 600 F.3d at 1320-21.  Specifically, *Abdulhaseeb* affirmed the district court's ruling that a failure to pay a Muslim spiritual leader and to buy soft-cover Islamic books did not create a substantial burden.  *Id.*; *Abdulhaseeb v. Calbone*, 2008 WL 904661, at *26-27 (W.D. Okla. April 2, 2008).

Like plaintiff's claim regarding access to a Quran, it is not clear how any policy of WCJ prevented plaintiff's access to an Imam.  Plaintiff argues that defendant did not provide access to an Imam, but does not explain how this creates a substantial burden under *Yellowbear*.  Docket No. 126 at 17.  Plaintiff was not required to engage in an activity that violated his beliefs, and he was not pressured to violate his religious beliefs. Plaintiff argues it is his strongly held belief that he must be in contact with an Imam, but does not dispute that WCJ allowed him to search for an Imam on his own.  *See id.* at 17-18.  Plaintiff argues that he must receive religious counseling without explaining how defendant or anyone at WCJ prevented him from doing so.  *See id.*  He argues that a failure to provide "*any* access to an Imam, paid or unpaid" constitutes a violation of his First Amendment rights.  *Id.* at 18 n.4.  It is undisputed that plaintiff was able to contact an Imam, but plaintiff did not receive a response back.  Docket No. 105 at 7, ¶ 38.

Regarding plaintiff's first theory, that WCJ should have found a volunteer Imam, plaintiff has shown no evidence that defendant obstructed his access to a volunteer Imam in any way.  The WCJ allowed plaintiff to contact Imams, and plaintiff did contact at least one Imam.  *Id.*  Moreover, the WCJ chaplain contacted everyone plaintiff suggested as a volunteer, provided plaintiff with information to contact mosques in the Front Range, contacted mosques in Greeley, Boulder, and Fort Collins, asked the president of the Islamic Center of Fort Collins to volunteer or recommend volunteers, and consulted with a consortium of Front Range jail chaplains.  *Id., ¶¶* 34-36.  Far from denying plaintiff access to a volunteer, the WCJ chaplain made repeated efforts to secure a volunteer Imam and helped plaintiff in his attempts to locate a volunteer Imam.

Plaintiff argues that the Tenth Circuit has ruled that "inmates should have access to clergy or appropriate religious counseling."  Docket No. 126 at 18, (citing *McKinley*, 493 F. App'x at 930, and *Cruz*, 405 U.S. at 319).  In *McKinley*, the Tenth Circuit ruled that it was a violation for defendants to "intentionally prevent[]" plaintiff from attending religious services.  493 F. App'x at 933.  In *Cruz*, the Supreme Court ruled that a Buddhist plaintiff, who was denied access to a chapel that members of other religious beliefs were allowed to use, stated a claim for violation of his First Amendment rights because "he was denied a reasonable opportunity of pursuing his faith comparable to the opportunity afforded fellow prisoners."  405 U.S. at 322.  Plaintiff has not identified any WCJ policies that impeded plaintiff's access to a volunteer Imam or shown evidence that plaintiff was provided less of an opportunity to access a religious leader than prisoners of other faiths.

As to plaintiff's second theory, that defendant prevented plaintiff from accessing an Imam by refusing to provide a paid Imam, plaintiff has failed to show this causes plaintiff a substantial burden.  Plaintiff argues that, because the facility where he is currently housed (Sterling Correctional Facility) provides him with access to an Imam weekly, WCJ's refusal to "spend even a modest amount to provide some level of access to an Imam" presents a factual dispute.  Docket No. 126 at 17.  Plaintiff, however, has not demonstrated that a failure to hire an Imam causes a constitutional violation.  Plaintiff points to no precedent from the Tenth Circuit or otherwise that demonstrates that a failure to hire a paid Imam can constitute a substantial burden.  *Id.*  Plaintiff's suggestion that WCJ must subsidize and facilitate religious activities, as opposed to refraining from prohibiting religious exercises, by spending a "modest amount" is not supported by any

cases that plaintiff cites.  Accordingly, summary judgment is appropriately granted on this claim because defendant has shown that it is undisputed that plaintiff did not face a substantial burden based on WCJ's failure to successfully facilitate plaintiff's contact with an Imam.

Even if plaintiff could show a substantial burden, defendant argues he is entitled to qualified immunity because plaintiff cannot show a constitutional violation based on a failure to facilitate religious activities.  Docket No. 105 at 18.  Plaintiff responds that "inmates should have access to clergy or other appropriate religious counseling." Docket No. 126 at 18.  For the reasons discussed above, the Court agrees with defendant that plaintiff identifies no caselaw stating that a constitutional violation under the Free Exercise Clause can result from a failure to facilitate access to religious counsellors, as opposed to a prohibition on participating in religious counseling. Plaintiff's claim regarding access to an Imam will be dismissed on the alternative basis of qualified immunity.

### E.  Prison Litigation Reform Act

The Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e, provides in relevant part that a "prisoner confined in a jail, prison, or other correctional facility" may not bring a federal civil action "for mental or emotional injury suffered while in custody without a prior showing of physical injury."  42 U.S.C. § 1997e(e).  The PLRA applies to Free Exercise claims.  *Searles v. Van Bebber*, 251 F.3d 869, 877-78 (10th Cir. 2001).

Defendant argues plaintiff's claim for compensatory damages are barred by the PLRA.  Docket No. 105 at 18-20.  The complaint alleges

> Hall suffered physical injuries because of his inability to attend Jum'ah.
> Hall suffers from several mental-health disorders, including bipolar

disorder and severe anxiety.  Because he was unable to practice his religion, his mental health deteriorated to the point that he harmed himself multiple times.  He was placed on suicide watch on two occasions because of this self-harm.

Docket No. 77-2 at 7, ¶ 49.  Defendant argues that plaintiff does not allege any harms that are compensable under the PLRA because plaintiff's injuries are self-inflicted and *de minimis*.  Docket No. 105 at 19-20.  Plaintiff argues that self-inflicted injuries are not explicitly excepted from the PLRA and an exception should not be read into the Act.  Docket No. 126 at 18-19.  Additionally, plaintiff argues that a jury could find plaintiff's injuries were not *de minimis*.  Neither party directly addresses whether plaintiff's injuries are physical injuries.

While plaintiff argues that he suffered "physical injuries," he defines such injuries as the physical manifestations of his mental health disorders.  *See* Docket No. 77-2 at 6, 8, ¶¶ 44, 49, 53.  These allegations are insufficient to withstand the "physical injury" requirement of Section 1997e(e).  A straightforward reading of Section 1997e(e) requires that a prisoner cite a physical injury that is separate from mental and emotional injuries he may have suffered.  Consistent with this reading, a number of courts have held that a prisoner cannot satisfy Section 1997e(e) by alleging that he only suffered from the physical manifestations of mental or emotional injuries.  *See, e.g., Davis v. District of Columbia*, 158 F.3d 1342, 1349 (D.C. Cir. 1998) (affirming *sua sponte* dismissal with prejudice despite prisoner's affidavit stating that he suffered weight loss, appetite loss, and insomnia after disclosure of his medical status because the language and purpose of Section 1997e(e) "preclude[s] reliance on the somatic manifestations of emotional distress"); *Cooksey v. Hennessey*, 2007 WL 2790365, *1 (N.D. Cal. Sept. 20, 2007) ("Physical symptoms that are not sufficiently distinct from a plaintiff's allegations

of emotional distress do not qualify as 'a prior showing of physical injury.'"); *Minifield v. Butikofer*, 298 F. Supp. 2d 900, 905 (N.D. Cal. 2004) (same); *Cannon v. Burkybile*, 2000 WL 1409852, *6 (N.D. Ill. Sept. 25, 2000) (allegations of headaches, insomnia, stress, and stomach anxiety insufficient to meet the physical injury requirement under Section 1997e(e)); *Cain v. Virginia*, 982 F. Supp. 1132, 1135 & n.3 (E.D. Va. 1997) (depression and severe headaches caused by emotional distress not a "physical injury" under the PLRA).  Here, plaintiff's allegations suggest that any physical injuries he suffered stemmed directly from his alleged mental and emotional injuries.  As derivative manifestations of mental or emotional injuries, these alleged physical injuries cannot support claims for damages pursuant to 42 U.S.C. § 1997e(e).  The Court will dismiss plaintiff's claim for compensatory damages for his remaining Free Exercise claim.

## IV.  CONCLUSION

For the foregoing reasons, it is

**ORDERED** that Defendant Lieutenant Elbe's Motion for Summary Judgment [Docket No. 105] is **GRANTED in part** and **DENIED in part**.  It is further

**ORDERED** that plaintiff's first, second, and fourth claims of First Amendment violations are dismissed.  It is further

**ORDERED** that plaintiff's claims for compensatory damages are dismissed.

DATED November 9, 2022.

BY THE COURT:

PHILIP A. BRIMMER
Chief United States District Judge